

U.S. Department of Justice

United States Attorney
Eastern District of New York

NJM:ADR  
F. #2025R00082

271 Cadman Plaza East  
Brooklyn, New York 11201

May 21, 2025

**By ECF and Email**

The Honorable Marcia M. Henry  
United States Magistrate Judge  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

   Re:  United States v. Sharon Gohari  
      Magistrate Docket No. 25-172

Dear Judge Henry:

  The defendant Sharon Gohari is scheduled to be arraigned today on the above-referenced Complaint, which charges him with receiving child sexual abuse material ("CSAM"), in violation of 18 U.S.C. § 2252(a)(2). *See* ECF No. 1. As explained in greater detail below, the defendant, a 47-year-old professional alien smuggler who splits his time between Iran and Roslyn, New York, received and stored multiple videos on his phone depicting the rape of children as young as roughly five years old and, in response to the videos, stated his intention to seek out sex in a high school.

  For the reasons set forth below, the government respectfully submits that the Court should enter an order of detention pending trial, because there is a presumption of detention due to the nature of the charges and because the defendant presents both a danger to the community and a risk of flight.[1]

  I.  Relevant Facts

  Gohari is a naturalized United States citizen from Iran who resides in Roslyn, New York, and travels frequently to Iran. Gohari first entered the United States in October 2000 and resided outside the country from approximately 2010 through 2021.

---

[1]  Detailed herein is a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendant. *See United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000) (holding that the government is entitled to proceed by proffer in detention hearings).

A. The Government's Alien Smuggling Investigation

The Federal Bureau of Investigation ("FBI") has been investigating a suspected scheme by Gohari to solicit and receive payment from Iranian nationals and others seeking to enter the United States in exchange for arranging and facilitating their entry. Gohari is not charged for this conduct in the instant Complaint, but as described further below, his extensive experience arranging illegal travel around the world gives rise to a significant risk of flight should he be released on bond. That experience is broad and well documented. For example:

- An Iranian national ("Alien-1") who entered the United States illegally and was arrested by border patrol officers in 2021 told FBI agents that he paid $4,800 to Gohari (whom he identified in a photograph) to facilitate his travel into the United States from Mexico.

- A second Iranian national ("Alien-2") who entered the United States illegally and was arrested by border patrol officers in 2021 told FBI agents that he entered the United States from Mexico with Gohari's assistance.

- A third Iranian national ("Alien-3") who entered the United States illegally and was arrested by border patrol officers in 2021 told FBI agents that Gohari helped facilitate his travel into the United States from Mexico. Alien-3 stated that Gohari provided him with detailed instructions on how to obtain a travel visa at the Mexican embassy in Iran, and that Gohari knew individuals at the embassy. Alien-3 stated that Gohari instructed him to arrive at the Mexican embassy with his mother because it would make it appear as though Alien-3 intended to return to Iran after traveling to Mexico, even though he did not intend to return. Alien-3 stated that he traveled from Iran to Turkey and then from Turkey to Mexico with Alien-1 and Alien-2 and that, during their travel from Mexico into the United States, Alien-1 and Alien-2 were in constant contact with Gohari and received guidance from him. Alien-3 stated that he had previously completed tasks in Iran and Malaysia for Iran's Islamic Revolutionary Guard Corp ("IRGC"), which has been designated by the United States Department of State as a Foreign Terrorist Organization ("FTO"). (The government is not alleging at this time that Gohari acted at the direction of the IRGC.)

On or about January 24, 2025, Gohari participated in a voluntary interview with FBI agents at John F. Kennedy International Airport ("JFK") in Queens, New York, in connection with the FBI's investigation, after returning from Iran through Doha, Qatar. During the interview, Gohari provided his verbal and signed written consent for FBI agents to conduct a search of his mobile device (the "Device"). Gohari indicated that the Device belonged to him and provided it to FBI agents along with the password. On or about February 7, 2025, even though Gohari had consented to a full review of the Device, in an abundance of caution, FBI agents obtained judicial authorization to search the Device. *See* 25-MC-541. On or about March 7, 2025, FBI agents obtained expanded judicial authorization to search the Device for evidence of child sexual abuse material. *See id.*

During a manual review of the Device at JFK, FBI agents discovered additional evidence of Gohari's alien smuggling activities, including:

- Numerous communications with foreign telephone numbers, including telephone numbers based in Mexico and Iran. A review of these communications, which appeared in both Spanish and Farsi, revealed extensive communications suggestive of the solicitation and coordination of the unlawful entry of foreign nationals to the United States from Iran and other North, Central, and South American countries, including Mexico, Guatemala, Honduras, Nicaragua, and Venezuela.

- In a January 2024 WhatsApp conversation in Spanish with a Mexican telephone number saved in the Device as "Rufuno," Gohari advised that there were two or three "pasajeros" (Spanish for "passengers") that had to "leave early." Gohari advised that the passengers only had visas for Cuba, Brazil and Venezuela and that they would be ready in ten days. "Rufuno" asked Gohari where the passengers were going and Gohari responded, "Tijuana." "Rufuno" then clarified whether the passengers were traveling from Iran to Tijuana. Gohari responded, "USA." "Rufuno" confirmed, "From Iran to USA." Gohari explained that the passengers would obtain Mexican visas and travel to Tijuana. Gohari stated, "I have to find a way… Help me my good friend." Gohari further explained, "Latin countries do not have embassies in Iran. Only Cuba, Mexico, Brazil, and Venezuela." Later in the conversation, Gohari asked for pricing for Iranian nationals, without visas, to travel to the United States from different Central and South American countries. "Rufuno" provided the price of $14,000 for passengers traveling from Venezuela, "10500" for passengers traveling from Nicaragua, and "9500" for passengers traveling from Guatemala. Gohari responded, "Perfect."

- In a January 2025 Telegram chat, FBI personnel observed videos appearing to show various forms of Iranian identification documents. The videos were sent with various emojis, including the Iranian flag, and other various communications in Farsi.

- In a December 2024 WhatsApp conversation Gohari appeared to engage in extensive communications in Farsi regarding document forgery and alien smuggling. Gohari shared a video of what appeared to be an individual recording himself speaking Farsi while at an airport. An unofficial draft translation by FBI personnel has revealed that the individual indicated in the video that he was leaving Iran. The FBI's investigation revealed that soon thereafter that individual, an Iranian national ("Alien-4"), entered the United States and is currently the subject of removal proceedings.

Upon further review of the Device pursuant to Gohari's signed consent and the above-mentioned search warrants, the FBI learned that Gohari engaged in extensive additional communications about alien smuggling. As one example, in June 2024, Gohari stated to another individual, "I would like us to work together on a few passengers // I will pay you the cost however you would like. Thank you." Later in the conversation, the individual asked Gohari about his smuggling activities. Gohari indicated that he had a team in Tijuana and that he helped individuals get from Iran to Mexico and then into the United States in large groups.

Moreover, videos sent to Gohari appear to show the production of U.S. travel documents, including a U.S. visa and Lawful Permanent Resident ("LPR") card, with various sophisticated techniques, including laser printing, black light testing, and chip/RFID scanning. Based on a review of law enforcement databases, the name and number on the front of one such card do not appear to be connected with any actual individual. Moreover, an alien registration number on the back of the card appeared to be improperly formatted and was associated with a different individual than the one named on the front of the card.

Lastly, agents identified communications since July 2023 in which an individual requested Gohari's assistance in facilitating her brother's travel from Iran to the United States, and in which Gohari agreed to, and attempted to, provide such assistance. Gohari has been in touch with that individual as recently as May 11, 2025, just days ago.

### B. Discovery of CSAM on Gohari's Device

While reviewing the Device in connection with the alien smuggling investigation, FBI agents came across multiple videos constituting what appeared to be child sexual abuse material ("CSAM"). The videos were sent to Gohari by an unknown WhatsApp user with an Iranian phone number in a WhatsApp conversation that spanned from on or about November 28, 2022, through on or about January 24, 2025.

In particular, on or about January 11, 2024, as described in the Complaint, Gohari received: (i) a 44-second video depicting a male anally penetrating with his erect penis a prepubescent female who appears to be approximately five years old; (ii) a 1-minute 13-second video depicting a male vaginally penetrating with his erect penis a prepubescent female who appears to be approximately ten years old; and (iii) a 3-minute 29-second video depicting a prepubescent female who appears to be approximately ten years old displaying and touching her vagina and anus and being touched by another individual on her vagina and anus. *See* Complaint ¶ 5.

Following receipt of the videos, on or about that same day, Gohari exchanged messages in Farsi with the sender. Based on an unofficial draft translation by FBI personnel, in sum and substance, Gohari asked about the sender's sexual activities that night, the sender indicated that he desired to have sexual relations with "younger" individuals, and Gohari responded that they should go together to a high school for that purpose. Gohari resides less than one half mile away from a public high school. *See id.* ¶ 6.

On or about November 11, 2024, Gohari received an additional video from the same WhatsApp account. In particular, Gohari received a 2-minute 42-second video depicting two prepubescent females who appear to be approximately eight to ten years old removing their clothes and acting out various sexual positions on a bed. Just before sending the video, the sender stated in Farsi, in sum and substance, and based on an unofficial draft translation by FBI personnel, that he was curious to know where the girls in the video were located, and asked Gohari to watch the video and to tell him what language the girls were speaking. Gohari responded, in Farsi, "Russian," *see id.* ¶ 7, thereby confirming that he had watched the video.

4

   FBI agents also reviewed additional photos and videos stored on the Device. During the course of that review, agents observed hundreds of photos and videos of what appeared to be women in various public places throughout New York City, including on trains and at cafes, who did not appear to be aware that they were being photographed or recorded. Some of the photos and videos appeared to be taken at close range, including several photos that were angled in an apparent attempt to capture the insides of the women's skirts or other garments. Other photos and videos depicted the same women in multiple locations, indicating that the women had been followed. *See id.* ¶ 8. Gohari sent some of these photos and videos to the same account from which he received the CSAM described above.

II. <u>Legal Standard</u>

   Under the Bail Reform Act, Title 18, United States Code, Section 3141, *et seq.*, federal courts are required to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. *See* 18 U.S.C. § 3142(e) (a judicial officer "shall" order detention if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of dangerousness must be supported by clear and convincing evidence. *See United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. *See United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987); *Chimurenga*, 760 F.2d at 405.

   The Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g).

   For certain offenses, including the CSAM charge contained in the Complaint, the law presumes that there is no set of conditions that will reasonably assure the defendant's appearance or the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(E) (imposing a rebuttable presumption of detention for offenses involving minor victims under 18 U.S.C. § 2252(a)(2) and other offenses).

   This presumption may be rebutted by the defendant, provided the defendant is able to present evidence that he is neither a danger nor a risk of flight. *See United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). Even upon such a showing, however, the presumption in favor of detention "does not disappear entirely, but remains a factor to be considered among those weighed[,]" *id.*, because it "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial" and "represents Congressional findings that certain offenders are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions." *United States v. Stone*, 608 F3d 939, 945-46 (6th Cir. 2010) (internal quotation marks and citation omitted) (alteration adopted).

   III.    The Court Should Enter an Order of Detention for the Defendant

Gohari is charged with an offense that triggers a presumption of detention. Regardless, every factor to be considered in the detention analysis demonstrates that the defendant presents both a significant danger to the community and a substantial risk of flight if released on bond. Accordingly, the Court should enter an order of detention pending trial.

   A.    The Charged Offenses and Danger to the Community

The defendant repeatedly received graphic videos depicting vicious sexual abuse of young children and made comments not only confirming that he intended to receive them and in fact watched them, but also indicating his desire and intent to go to a high school in order to seek out sex with a minor. Gohari's comments are particularly concerning given that he lives in such close proximity—just blocks away—from a public high school.

Moreover, additional evidence on his phone demonstrates Gohari's readiness to act upon his plans. Gohari had hundreds of photos and videos on the Device depicting the stalking and surreptitious recording of women throughout New York City (Gohari works in Manhattan), including following them from place to place and attempting to take photos up their garments. Gohari presents an immediate danger to the community and should be detained to protect the women and children he seeks to victimize and already has victimized.

   B.    The Weight of the Evidence

The weight of the evidence against the defendant is overwhelming. The videos were found on his personal phone and his communications with the sender upon receipt offer irrefutable evidence that he intended to receive the videos and in fact viewed them. Where, as here, the evidence of guilt is strong, it provides "a considerable incentive to flee." *United States v. Millan*, 4 F.3d 1038, 1046 (2d Cir. 1993); s*ee also United States v. Palmer-Contreras*, 835 F.2d 15, 18 (1st Cir. 1987) (*per curiam*) (where "the evidence against defendants is strong, the incentive for relocation is increased").

Moreover, the charged offense carries a mandatory minimum sentence of five years' imprisonment and a maximum sentence of 20 years' imprisonment. *See* 18 U.S.C. § 2252(b)(1). The prospect of a lengthy term of incarceration further gives rise to a serious risk of flight. *See United States v. Jackson*, 823 F.2d 4,7 (2d Cir. 1987); *United States v. Martir*, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses whose maximum combined terms created potent incentives to flee); *United States v. Cisneros*, 328 F.3d 610, 618 (l0th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond).

   C.    The Defendant's History and Characteristics

Gohari's history and characteristics demonstrate that he is a danger to the community, for all of the reasons discussed above. He also presents a substantial risk of flight. Gohari has significant ties to Iran including a son there and a network of associates, and travels to Iran frequently. Indeed, he lived outside the United States from 2010 to 2021 and has connections all over the world. He has an Iranian passport and apparent connections to foreign

embassies in Iran and elsewhere. The investigation further indicates that he likely has bank accounts and property in Iran as well. Moreover, Gohari is in the business of smuggling individuals across borders illegally and is deeply familiar with the means and methods required to travel illegally while avoiding detection by law enforcement. As described above, he has also demonstrated an ability to procure falsified travel documents. Crucially, late last week, FBI agents learned that Gohari told an Iran-based associate that he was planning to travel to Iran this week because he believed the FBI was investigating him. Gohari admitted to FBI agents following his arrest that he obtained a new Iranian passport on or about May 13 and was indeed planning to travel to Iran this week; he claimed it was for different reasons.

Finally, any proposed use of home detention and/or electronic monitoring in lieu of detention is insufficient here in light of Gohari's risk of flight described above. Such a proposal "at best elaborately replicate[s] a detention facility without the confidence of security such a facility instills." *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993); *see United States v. Zarrab*, 2016 WL 3681423, at *10 (S.D.N.Y. June 16, 2016). Here, such an arrangement is inadequate to ensure that this defendant will not flee.[2]

---

[2] Recent history in this district bears this out, with numerous defendants fleeing or otherwise attempting to thwart electronic monitoring after being released on conditions. *See United States v. Roberto Cruz-Rodriguez*, 23-CR-224 (JS) (in May 2025 defendant charged with illegal reentry by a convicted felon cut his electronic monitoring device, left it on his front lawn, and absconded); *United States v. Stanley Elianor*, 16-CR-288 (AMD) (in March 2025 defendant fled after being arraigned on a violation of supervised release for attacking a witness who had previously testified against him in a state murder trial); *United States v. Guanghua Shen*, 25-CR-48 (HG) (in January 2025 defendant cut her electronic monitoring device at JFK Airport the day before she was required to surrender to the Bureau of Prisons); *United States v. Svetlana Dali*, 24-MJ-645 (JAM) (in December 2024 defendant cut her location monitoring device while on pretrial release and absconded to Canada, where she was apprehended at the border); *United States v. Luis Manuel Pastor*, 15-CR-8 (MKB) (between September and November 2024 defendant with pending VOSR relating to state firearms offense cut his electronic monitoring device twice; after failing to appear at a hearing to address the second cutting incident, the defendant fled, threw another electronic monitoring device in the river and was only apprehended when he was arrested by the NYPD on separate charges); *United States v. Horst Jicha*, 23-CR-342 (OEM) (in October 2024 defendant charged with securities fraud and associated crimes cut his location monitoring device while on pretrial release and absconded days before he was supposed to appear for a status conference); *United States v. Tony Clanton*, 23-CR-328 (KAM) (in March 2024 defendant fled after cutting his location monitoring device on the eve of trial); *United States v. Georges Barker*, 23-MJ-27 (SIL) (defendant in an extradition proceeding tampered with his location monitoring bracelet on two occasions before he was remanded in December 2023); *United States v. Dewayne Tripp*, 22-CR-336 (MKB) (in June 2023 defendant absconded instead of appearing at a bond revocation hearing and was only located after being arrested for a domestic violence incident); *United States v. Marcus Deloatch*, 21-CR-457 (ENV) (in June 2023 defendant charged with Hobbs Act robbery cut his location monitoring device and fled in advance of a bail revocation hearing); *United States v. Stephanie Cox*, 23-CR-133 (RPK) (in August 2023 defendant charged with methamphetamine trafficking was released on bond following her arrest in California so she could attend an in-patient drug treatment program pending her removal to the Eastern District of New York; instead, she

7

IV.     Conclusion

For the foregoing reasons, Gohari should be detained pending trial. Gohari is charged with an extremely serious offense that carries a presumption of detention. The government respectfully submits that no condition or combination of conditions will assure the safety of the community, the defendant's return to Court, or his compliance with the Court's directives.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:   /s/
Andrew D. Reich
Assistant U.S. Attorney
(718) 254-6452

cc:   Clerk of Court (by Email)
Counsel of Record (by Email)

---

absconded from the treatment facility after two days and was not rearrested for five months); *United States v. Porfirio Antonio Rodriguez*, 21-CR-329 (GRB) (in September 2022 defendant charged will illegal reentry by a convicted felon absconded); *United States v. Joey Macario*, 22-CR-342 (HG) (in August 2022 defendant charged with fraud absconded after removing his location monitoring device and discarding it on the subway tracks moments after being released to attend drug treatment); *United States v. Marius Lacatis*, 22-CR-190 (BMC) (in July 2022 defendant, a Romanian national involved in a fraud conspiracy, was released on bond following his arrest in California and ordered to report to the Eastern District of New York; instead, he cut his location monitoring device and fled); *United States v. William Bartell*, 22-CR-80 (EK) (in May 2022 defendant charged with multiple bank robberies cut his location monitoring device and absconded within one week of being released on bail due to medical issues); *United States v. Herman Baron*, 21-CR-307 (NGG) (in May 2022 defendant charged with narcotics trafficking and COVID fraud cut his location monitoring device and fled the jurisdiction approximately one hour before his scheduled change-of-plea hearing; arrested five months later in the Northern District of Georgia); *United States v. Sinmyah Amera Ceasar*, 22-CR-459, 19-CR-117, 17-CR-048 (KAM) (in August 2021 defendant cut her electronic monitoring device and tried to flee the country after the Second Circuit ordered her resentenced and the government discovered evidence of her violation of release conditions); *United States v. Michael Artis*, 20-CR-409 (PKC) (in June 2021 defendant released following a violation of his supervised release conditions cut his location monitoring device and failed to appear at bail revocation hearing); *United States v. Charles May*, 19-CR-539 (FB) (in January 2021 defendant charged with armed robbery absconded while on home detention).